NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE, | Civil Action No. 17-1709 (JLL) |
| Petitioner, | OPINION |
| v. | |
| ORLANDO RODRIGUEZ, | |
| Respondent. | |

**LINARES**, Chief District Judge:

Presently before the Court is the Amended Petition for a Writ of Habeas Corpus and Motion for a Preliminary Injunction of Petitioner, John Doe, filed pursuant to 28 U.S.C. § 2241 (ECF No. 17, 24). The Government filed a response to the Amended Petition and Motion, (ECF No. 27), to which Petitioner has replied. (ECF No. 31). The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the following reasons, the Amended Petition shall be dismissed without prejudice and Petitioner's Motion for a Preliminary Injunction shall be denied without prejudice as moot in light of the dismissal of his petition.

**I. BACKGROUND**

Petitioner, John Doe, is a native and citizen of Afghanistan. (*See* ECF No. 27-1 at 2). Between 2012 and 2017, Petitioner was employed as a waiter and cashier by a United States contractor performing services at the U.S. Embassy in Kabul. (*Id.*). In December 2016, Petitioner was granted a Special Immigrant Visa under the SQ1 program, which provides special visas to

1

"Afghan nationals who have been employed by or on behalf of the United States Government in Afghanistan and who have experienced an ongoing serious threat as a consequence of such employment." (*Id.*). On March 12, 2017, Petitioner boarded a flight to Newark, New Jersey, where he arrived the following day. (*Id.*).

Upon his arrival, Petitioner, as an applicant for admission into the United States, was reviewed by a primary-inspection and processing agent. (*Id.*). After an initial review, this agent stamped Petitioner's passport "admitted," which the Government contends was done erroneously, as Petitioner's admission review had not yet been completed. (*Id.*). In any event, Petitioner was not permitted to leave the airport at that time, but was instead referred to secondary-inspection processing for further review and an interview. (*Id.*). At some point between the conclusion of the initial review and the completion of secondary-inspection, customs officials contacted the Department of State concerning Petitioner's visa and apparently requested that the visa be revoked. (*Id.*). The Department of State thereafter revoked the visa and informed the customs officials about the revocation. (*Id.* at 3). Petitioner was thereafter prepared to be returned to Afghanistan and was scheduled for departure on March 15, 2017. (*Id.*).

In preparation for his flight, Petitioner was temporarily transferred to the Elizabeth Detention Center. (*Id.*). Counsel thereafter filed a habeas petition on Petitioner's behalf seeking Petitioner's release, as well as a motion for an emergency injunction seeking to block Petitioner's removal from the country. (*Id.*; *see also* ECF No. 1). This Court denied that injunction request, and Petitioner appealed. (ECF No. 7, 8). On March 15, 2017, the Third Circuit granted Petitioner a temporary stay from removal without ruling on any of Petitioner's other requests or addressing this Court's prior opinion and order. (ECF No. 10). Petitioner thereafter withdrew his appeal with

the Government's consent so that he could complete the litigation of his habeas petition. (ECF No. 12).

On March 24, 2017, an asylum officer interviewed Petitioner and determined that he had a credible fear of persecution if he returned to Afghanistan. (ECF No. 27-1 at 3). That same day, DHS issued Petitioner a Notice to Appear, alleging that he was inadmissible. (*Id.*). As part of those proceedings, Petitioner filed a motion before the immigration court in which he argued that his removal proceedings should be terminated because he had been admitted to the United States as an SQ1 immigrant when his passport was stamped, and that the revocation was invalid. (*See id.* at 7). By way of an opinion and order issued on August 11, 2017, an immigration judge denied that motion, finding that, because Petitioner had never completed secondary inspection, he had never been admitted into the country for immigration purposes, and that Petitioner therefore remained an applicant for admission following the revocation of his visa. (*Id.* at 7–9). After determining that the relevant statutes and regulations permit the State Department to revoke Petitioner's SQ1 visa at any time prior to admission into the United States, the immigration judge explained his determination that Petitioner had never actually been admitted, regardless of the stamp in his passport, as follows:

> Admission is defined as the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer." INA § 101(a)(13)(A). The [Board of Immigration Appeals ("BIA")] has held that an application for "admission" is a continuing one, rather than an act limited to the exact time that the alien enters the United States. *See Matter of Valenzuela-Felix*, 26 I&N Dec. 53, 56 (BIA 2012). In *Matter of Valenzuela-Felix*, the BIA explained:
>
>> [T]he Attorney General and [the] Board have consistently treated an application for admission as a continuing one and have held that, ultimately, admissibility is authoritatively determined on the basis of the law and facts existing, not at the time the alien first presents himself at the port of entry, but at

3

> the time the application for admission is finally considered during the proceedings before the Immigration Judge.

*Id.* at 56. *Accord Minto v. Sessions*, 854 F.3d 619, 624 (9th Cir. 2017); *Ali v. Reno*, 22 F.3d 442, 448 n. 3 (2d Cir. 1994); *Munoz v. Holder*, 755 F.3d 366, 372 (5th Cir. 2014); *Palmer v. I.N.S.*, 4 F.3d 482, 485 n. 11 (7th Cir. 1993). Although the Third Circuit and the BIA have addressed the parameters of the definition of "admission" in other contexts—i.e., adjustment of status, returning lawful permanent residents, and departure from the U.S.—they have not decided whether an alien who presents himself at a port of entry and who receives an erroneous admission stamp has been "admitted." *See, e.g., Taveras v. Att'y Gen.*, 731 F.3d 281, 290 (3d Cir. 2013) (interpreting the term "seeking admission" under § 101(a)(13)(C)(v)); *Martinez v. Att'y Gen.*, 693 F.3d 408, 413–14 (3d Cir. 2012) (comparing the definition of "admitted" to the term "lawfully admitted for permanent residence"); *Totimeh v. Att'y Gen.*, 666 F.3d 109 (3d Cir. 2012) (holding that the date of an alien's adjustment of status was not a "date of admission" for purposes of determining whether alien was subject to removal for a crime involving moral turpitude); *Tineo v. Ashcroft*, 350 F.3d 382, 384 (3d Cir. 2003) (analyzing whether a returning lawful permanent resident was properly classified as an alien "seeking an admission"); *see also Matter of Espinosa Guillot*, 25 I&N Dec. 653 (BIA 2011); *Matter of Rodarte*, 23 I&N Dec. 905 (BIA 2006).

In addition, although the traditional test for entry—(1) physical presence; (2) inspection and admission by an immigration officer, or actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint—is of limited importance given the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRAIRA"), the test still remains relevant. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub.L. No. 104-208, 110 Stat. 3009-546 (1996); *Yang v. Maugans*, 68 F.3d 1540 (3d Cir. 1995); *Matter of Z*, 20 I&N Dec. 707 (BIA 1993). IIRAIRA replaced the term "entry" with "admission," and defined "admission" as the "lawful *entry* of the alien into the United States after inspection and authorization by an immigration officer," INA § 101(a)(13)(A). Given that the term "admission" requires a "lawful entry," the pre-IIRAIRA definition of entry is therefore applicable.

In the instant case, [Petitioner] arrived at Newark Liberty International Airport and the visa page of his passport was stamped as "admitted." DHS, however, contends that [Petitioner's] passport

> was "erroneously stamped with an admission stamp prior to the completion of his immigration processing." Notwithstanding the admission stamp during primary-inspection processing, the exact timing of the stamp is not necessarily dispositive here; when [Petitioner] landed at the airport, he became an applicant for admission, a status that he retained throughout his entire airport processing. Even though he was initially stamped as admitted, his application for admission was not yet complete; he was referred to secondary inspection, where the [Department of State] revoked his SQ1 visa, he was informed of the revocation, and he was asked whether he wished to withdraw his application for admission to the U.S., to which he agreed. Moreover, [the Department of Homeland Security] has submitted a statement from a [customs deputy chief officer] stating that the admission stamp was erroneous. The fact that the stamp was erroneous further supports the contention that [Petitioner's] admission was not a lawful entry. In addition, [Petitioner] does not satisfy the third requirement of a "lawful entry"—namely, freedom from official restraint. *See Yang v. Maugans*, 68 F.3d 1540 (3d Cir. 1995). On the contrary, he was questioned by [customs] officers during the pendency of his secondary-inspection processing. Thus, in reviewing the "basis of the law and facts" existing at the time the application for admission is considered during proceedings, the Court finds that [Petitioner] was not "admitted" to the United States. *See Valenzuela-Felix*, 26 I&N Dec. at 56. As such, the State Department was authorized to properly revoke his visa.

(ECF No. 27-1 at 7–8 (citations omitted)). The immigration judge, based on his finding that Petitioner remained an applicant for admission without a valid visa, sustained the charge that Petitioner was inadmissible, denied Petitioner's motion to terminate his proceedings, and denied Petitioner's request for a bond redetermination, as the immigration court has no authority to conduct bond hearings for applicants for admission detained under 8 U.S.C. § 1225. (*Id.* at 9).

## II. DISCUSSION

### A. Legal Standard

Pursuant to 28 U.S.C. § 2241(c), this Court has jurisdiction to provide an immigration detainee with habeas relief only when the detainee is "in custody" and that custody is allegedly "in

5

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *see also Maleng v. Cook*, 490 U.S. 488, 490 (1989). As Petitioner is currently detained within this Court's jurisdiction, by a custodian also within the Court's jurisdiction, and asserts that his continued detention violates due process, this Court has jurisdiction over his claims. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 494–95, 500 (1973); *see also Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).

**B. Analysis**

*1. The Limits of Habeas Jurisdiction*

Petitioner contends that he was admitted to the United States when his passport was stamped, that he automatically became a lawful permanent resident whose visa could not be revoked at that time, and that he is therefore not an arriving alien or applicant for admission subject to ongoing detention. (*See generally* ECF No. 17–2). In making this argument, Petitioner, either directly or indirectly, asks this Court to overrule the findings of the immigration judge quoted above—that Petitioner did not complete his inspection upon his arrival at the airport, that the revocation of his visa was both proper and occurred prior to the conclusion of his immigration inspection, and that Petitioner was therefore never admitted and remains an arriving alien who is treated as an applicant for admission. The Government contends, however, that this Court has no jurisdiction to make such a determination, as it was stripped of such jurisdiction by the REAL ID Act. (ECF No. 27 at 11–14).

In adopting the REAL ID Act, Congress restricted the jurisdiction of district courts to grant relief to Petitioner's challenging their orders of removal or actions related to such orders through habeas petitions. *See* 8 U.S.C. § 1252(a)(5). Pursuant to the Act:

> [n]otwithstanding any other provision of law (statutory or nonstatutory), including [28 U.S.C. § 2241], or any other habeas corpus provision, and [28 U.S.C. §§ 1361 and 1651, the statutes which provide the basis for mandamus jurisdiction,] a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e). For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms "judicial review" and "jurisdiction to review" include habeas corpus review pursuant to [28 U.S.C. § 2241], or any other habeas corpus provision, [28 U.S.C. §§ 1361 and 1651], and review pursuant to any other provision of law (statutory or nonstatutory).

8 U.S.C. § 1252(a)(5). The statute likewise provides that:

> [j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under [8 U.S.C. § 2241] or any other habeas corpus provision, by [28 U.S.C. §§ 1361 or 1651], or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9). As the Third Circuit has explained, Congress's goal in passing the REAL ID Act was to "streamline . . . uncertain and piecemeal review of orders of removal, divided between the district courts (habeas corpus) and the courts of appeals (petitions for review)," which Congress sought to achieve "[b]y placing all review in the courts of appeals [thus providing] an adequate and effective alternative to habeas corpus." *Verde-Rodriguez v. Att'y Gen.*, 734 F.3d 198, 206–07 (3d Cir. 2013). The limitations on jurisdiction imposed upon the courts by sections 1252(a)(5) and (b)(9), however, are inapplicable where a petitioner is not challenging an order of removal, including in those cases where a removal order has yet to be entered. *See Chehazeh v. Att'y Gen.*, 666 F.3d 118, 133 (3d Cir. 2012); *Kumarasamy v. Att'y Gen.*, 453 F.3d 169, 172 (3d

Cir. 2006). Because Petitioner has yet to receive an order of removal, the REAL ID Act does not bar his claims.

The Government also argues that Petitioner's claims that he was admitted into the United States and is therefore a lawful permanent resident have not been properly exhausted, and that this Court lacks jurisdiction to address them for that reason. (ECF No. 27 at 15). Immigration detainees seeking habeas corpus relief must administratively exhaust their claims before they may seek relief through the filing of a petition for habeas corpus. *See Duvall v. Elwood*, 336 F.3d 228, 233-34 (3d Cir. 2003); *Yi v. Maugans*, 24 F.3d 500, 503–04 (3d Cir. 1994). "[E]ven when an alien is attempting to prevent . . . [removal] proceeding[s] from taking place in the first instance and is thus not, strictly speaking, attacking a final order of [removal] . . . , it is well settled that judicial review is precluded if the alien has failed to avail himself of all administrative remedies" including both removal proceedings and an appeal to the Board of Immigration Appeals. *Duvall*, 336 F.3d at 233 (quoting *Massieu v. Reno*, 91 F.3d 416, 421 (3d Cir. 1996) (quotations omitted)). The exhaustion requirement both protects the authority of the administrative body and fosters judicial economy and efficiency. *Id.* Because the exhaustion requirement is jurisdictional, the failure of a habeas petitioner to present his claims first to the immigration courts and then to the Board is "fatal to the District Court's jurisdiction over [his] habeas petition." *Id.*

Although an immigration judge has rejected his claim that he was admitted into the United States for the reasons quoted, Petitioner has yet to complete his proceedings before the immigration judge and has not presented that claim to the Board of Immigration Appeals. Petitioner has thus failed to exhaust his administrative remedies as to that claim, and this Court has no jurisdiction to

address that claim until such time as it has been exhausted.[1] *Id.* Thus, for the purposes of Petitioner's remaining claims, this Court must consider Petitioner's status to be that found by the immigration judge—that of an arriving alien who has not been admitted and who is subject to detention under 8 U.S.C. § 1225(b).

As Petitioner requested, and was denied parole, (*see* ECF No. 24-2 ¶ 8), he has exhausted his claim that his continued detention under § 1225(b) without a bond hearing violates Due Process and the Court can, and will, address that claim.[2]

*2. The Propriety of Petitioner's Continued Detention Under § 1225(b)*

Petitioner argues that, even if he was not admitted to the United States and was an arriving alien at the time he was taken into custody, he should now be entitled to a bond hearing because his detention is overlong. (ECF No. 24-1 at 14–28). Preliminarily, Petitioner contends that, once a § 1225 detainee is placed into removal proceedings, his status becomes the same as that of an alien who was found within the United States who is subjected to removal proceedings, and his detention therefore converts detention pursuant to 8 U.S.C. § 1226. (*Id.* at 15–16). Petitioner, however, provides no support for that contention, and this Court is aware of no binding or persuasive authority for such a proposition. As both this Court and the Third Circuit have explained, § 1225 provides a basis for detention throughout removal proceedings separate and apart from that provided by § 1226. *See, e.g., Tineo v. Ashcroft*, 350 F.3d 382, 387 (3d Cir. 2003); *Damus v. Tsoukaris*, Civil Action No. 16-933 (JLL), 2016 WL 4203816, at *2 (D.N.J. Aug. 8, 2016). Indeed, § 1225 explicitly calls for the mandatory detention of an alien following an asylum

---

[1] Petitioner's unexhausted claim includes his assertions that he was actually admitted to the United States, that his visa was never actually revoked, and that he should be released because he has been admitted to the United States and is therefore not subject to detention under § 1225(b).

[2] The only administrative relief available to Petitioner for this claims is a request for parole under 8 U.S.C. § 1182.

officer's determination that an alien, such as petitioner, has a credible fear of persecution in his home country. *See* 8 U.S.C. § 1225(b)(1)(B)(ii). Section 1226, by contrast, controls the detention of aliens who have already effected entry into the United States and are now removable as a result of having committed a felony. *See, e.g., Gregorio-Chacon v. Lynch*, Civil Action No. 16-2768 (SDW), 2016 WL 6208264, at *2 (D.N.J. Oct. 24, 2016). Because Petitioner was not admitted into the country, and remains an applicant for admission subject to removal proceedings, he is detained pursuant to § 1225(b)(1)(B)(ii), and not § 1226(a).

Petitioner contends that even if he is subject to § 1225(b) detention, he should still be entitled to a bond hearing because his detention has become overlong and therefore Due Process would be violated if he were to continue to be held without a bond hearing. While this Court has not addressed such an argument in relation to detention under § 1225(b)(1)(B)(ii), this Court has addressed detention for unadmitted applicants for admission under § 1225(b)(2). *See Damus*, 2016 WL 4203816 at *2–4. As this Court explained:

> To the extent that Petitioner asserts a constitutional claim for relief [from immigration detention], such a claim would be affected by his status as an applicant for admission rather than an alien who has previously entered the country. *See, e.g., Maldonado v. Macias*, 150 F. Supp. 3d 788, 798–800 (W.D. Tex. 2015). Petitioner's status as an applicant for admission affects his right to Due Process because applicants for admission are subject to the "entry fiction" which provides that, for legal and constitutional purposes, an alien stopped at the border is considered to remain at the border even if he is paroled into the country, and is treated as such for the purpose of determining his rights to relief. *Id.*; *see also Kay v. Reno*, 94 F. Supp. 2d 546, 554 (M.D. Pa. 2000) (describing the "entry fiction"). The distinction is not one without a difference, as the Supreme Court in *Zadvydas* observed that it "is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders," and that "once an alien [for legal purposes] enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary or permanent." 533

U.S. at 693. The Court has likewise suggested that even for those aliens found within the United States, "the Due Process Clause does not require [the Government] to employ the least burdensome means to accomplish [the removal of those aliens]." *Demore v. Kim*, 538 U.S. 510, 523 (2003). Indeed, "the Supreme Court has made clear that inadmissible aliens are entitled to less due process than are resident aliens." *Maldonado*, 150 F. Supp. 3d at 799 (citing *Demore*, 538 U.S. at 547 (O'Connor, J., concurring)). Indeed, as *Zadvydas* explained, an alien's treatment "as if stopped at the border" has historically been held sufficient to justify lengthy and seemingly interminable detention. 533 U.S. at 692–93 (citing *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)). By all appearances, then, Petitioner, as an alien deemed an applicant for admission who is legally treated as if stopped at the border is entitled to something less than the full panoply of rights usually conferred by the Due Process Clause. *Cf. Rosales-Garcia v. Holland*, 322 F.3d 386, 412 (6th Cir. 2003) (en banc) (holding that at least the substantive portion of the Due Process Clause must apply to even those aliens at the border as to hold otherwise would permit the Government to "torture or summarily execute them" which would amount to an absurd proposition).

Thus, although Petitioner is likely not entitled to all the rights Due Process would provide an alien considered within this country, he has at least some entitlement to proper procedures. The question that arises, then, is whether mandatory detention *ad infinitum* comports with that entitlement. On this issue, however, neither the Supreme Court nor the Third Circuit has provided clear guidance. While the Third Circuit has not provided this Court with guidance as to whether indefinite detention under § 1225(b)(2)(A) comports with the Constitution, the Court has addressed a similar statutory provision in the form of § 1226(c). Like § 1225(b)(2)(A), § 1226(c) expressly provides that the Government shall take into custody those removable aliens who have been convicted of certain classes of offenses, and does not provide for a bond hearing once those aliens have been so detained. In *Diop*, however, the Third Circuit held that detention subject to § 1226(c) was subject to a reasonable time limitation as to interpret the statute to permit indefinite detention would run the risk of running afoul of the Due Process Clause. 656 F.3d at 231–32. Thus, as a matter of statutory interpretation and constitutional avoidance, the Third Circuit held that § 1226(c) authorized mandatory detention for only a reasonable period of time, after which the Government would be required to justify the alien's continued detention at an individualized bond hearing. *Id.* at 231–34.

Thus, the Third Circuit held in *Diop* that the federal courts, in determining whether an alien subject to mandatory detention under § 1226(c) was entitled to a bond hearing, must determine whether the length of his detention was "reasonable," which is a "function of whether it is necessary to fulfill the purpose of the statute." *Id.* at 234. Such a determination is a fact specific inquiry "requiring an assessment of all of the circumstances of a given case." *Id.* While the Court in *Diop* did not provide specific guidance as to the length of time which would cast doubt on the reasonableness of a given alien's detention, *see* 656 F.3d at 234; *see also Carter v. Aviles*, No. 13-3607, 2014 WL 348257, at *3 (D.N.J. Jan. 30, 2014), the Third Circuit provided further guidance in *Chavez-Alvarez*. In *Chavez-Alvarez*, the Third Circuit clarified that, at least where no evidence of bad faith on the part of the petitioner has been presented, "beginning sometime after the six-month timeframe [upheld by the Supreme Court in] *Demore*, and certainly by the time [the petitioner] had been detained for one year, the burdens to [the petitioner's] liberties outweighed any justification for using presumptions to detain him without bond to further the goals of the statute." 783 F.3d at 478.

Given this case law in regards to aliens present within this country subject to mandatory detention, the question here becomes whether the lesser amount of Due Process to which unadmitted aliens subject to the entry fiction are entitled requires that 1225(b)(2)(A) be interpreted to include a similar reasonableness limitation. Several Courts have held that the distinction between removable aliens present within this country and those not yet admitted and legally at the border is insufficient to warrant a difference in treatment, and that § 1225(b)(2)(A) is subject to a reasonable time limitation as a result. *See, e.g., Maldonado*, 150 F. Supp. 3d at 804–812; *Bautista v. Sabol*, 862 F. Supp. 2d 375, 377 (M.D. Pa. 2012); *see also Rodriguez v. Robbins*, 804 F.3d 1060, 1081–84 (9th Cir. 2015) (holding that aliens detained under §§ 1226(a), 1226(c), 1225(b)(2)(A), and 1231(a) are all entitled to a bond hearing after six months as all of those statutory provisions are subject to reasonable time limitations), *cert*[.] *granted sub nom., Jennings v. Rodriguez*, --- S. Ct. ---, 2016 WL 1182403 (June 20, 2016). Other Courts have instead held that inadmissible aliens are treated differently from those subject to removal already present within this country, and therefore are not entitled to release on bond during the pendency of their removal proceedings. *See, e.g., Perez v. Aviles*, ---- F. Supp. 3d ---, ---, 2016 WL 3017399, at * 3 (S.D.N.Y. 2016); *see also See* [sic] *Cardona v. Nalls–Castillo*, --- F.Supp.3d ---, ---, 2016 WL 1553430, at *1 (S.D.N.Y. Apr. 14, 2016); *Salim v. Tryon*, No. 13-6659, 2014 WL 1664413, at *2 (W.D.N.Y. Apr. 25, 2014)

(LPR was lawfully detained during removal proceedings under § 1225(b)(2)(A)); *Ferreras v. Ashcroft*, 160 F.Supp.2d 617, 622–27 (S.D.N.Y.2001) (holding the same for LPR detained for over 15 months); *Viknesrajah v. Koson*, No. 09-6442, 2011 WL 147901, at *5–6 (W.D.N.Y. Jan. 18, 2011) (holding § 1225(b) authorized continued detention of alien in custody for over two years during pendency of removal proceedings); *but see Arias v. Aviles*, No. 15-9249, 2016 WL 3906738, at *3 (S.D.N.Y. July 14, 2016) (disagreeing with *Perez* and holding that § 1225(b)(2)(A) is subject to a reasonable time limitation).

Having weighed the lesser Due Process rights to which applicants for admission are entitled with the grave specter of interminable detention, this Court must conclude that the former class of cases better encapsulate the state of the law and that an alien's detention subject to § 1225(b)(2)(A) is subject to the limitation that his detention may continue only for a reasonable time at which point his continued detention would need to be warranted by more than a presumption based on his status as an applicant for admission alone. In so concluding, however, this Court does not agree with the Ninth Circuit's conclusion that the distinction between an alien detained pending removal who is already in this country and one who remains legally at the border as an applicant for admission is without difference. The level of Due Process protections to which the two classes are entitled is not equal, and any remedy fashioned for applicants for admission would have to uphold and continue the entry fiction even if those aliens were released on bond or under an order of supervision. The Court also notes that there are distinctions between § 1225 and § 1226 which also must be taken into account in fashioning a remedy – specifically, under § 1226, for removable aliens present in this country, detention subject to bond is the default rule and mandatory detention the exception, whereas § 1225 essentially sets nigh mandatory detention as the default rule with parole for humanitarian reasons the exception.

In this case, however, the Court need not address these issues because this Court concludes that the length of Petitioner's detention has not yet reached a length of time wherein it has become unreasonable. While this Court agrees that § 1225(b)(2)(A) must be subject to a reasonable time limitation, what is reasonable under § 1225(b)(2)(A) for an applicant for admission not entitled to the greater protections provided to an alien already present in this country may well be unreasonable for those aliens detained under § 1226(c). Essentially, the distinction in the level of protections between the two classes of aliens is one of magnitude rather than entitlement to relief – an alien who is legally considered to remain

13

> at the border has no right of entry into this country and is entitled to lesser protections than one who has already entered, and as such he may be held for a greater length of time before his continued detention raises Due Process concerns. While it is unclear at what point in time such concerns would rise to the level of requiring redress, this Court concludes that Petitioner's current detention – for just under a year – does not appear to be unreasonable given the purposes of § 1225 that such detention serves – preventing the entry of an inadmissible alien into this country. It thus appears that detention of nearly a year would certainly be more reasonable under § 1225(b)(2)(A) than that which is reasonable under § 1226(c), given the lesser level of Due Process to which aliens subject to the entry fiction are entitled.

*Damus*, 2016 WL 4203816, at *2–4.

Although this Court's opinion in *Damus* addressed a different subsection of § 1225(b)—specifically § 1225(b)(2)(A)—rather than § 1225(b)(1)(B)(ii), under which Petitioner is detained, the controlling factor for determining what level of Due Process protection applies, as explained above, is the alien's entry status. *Id.* This Court therefore finds that the reasoning of *Damus* would apply equally to § 1225(b)(1)(B)(ii) detainees as they, like § 1225(b)(2)(A) detainees, are applicants for admission who are legally treated as if they remain at the border. Applying that rule to Petitioner, the record indicates that he has been detained for only ten months—nearly two months less than the petitioner in *Damus*. As this Court explained in *Damus*, detention for less than a year under § 1225(b) does not violate Due Process and Petitioner is therefore not entitled to relief based on the length of his detention at this time. The Court will therefore dismiss his Due Process challenge to § 1225(b) detention without prejudice, with permission to file a subsequent petition in the event that his detention does continue for a period sufficient to call the propriety of his continued detention without bond into question.

Petitioner also attempts to argue that the decision to deny his parole requests was improper because it did not follow certain administrative guidelines laid out by the Department of Homeland

Security. 8 U.S.C. § 1182(d)(5)(A) provides the basis for the granting of parole for applicants for admission and states that the "Attorney General may . . . in his discretion parole into the United States," on a case-by-case basis, an alien who has not been admitted. Based on the language of the statute, it is clear that release of a § 1225(b) detainee on parole is a discretionary administrative decision. *See Shimisany v. Thompson*, Civil No. 16-1755 (RBK/JS), 2017 WL 592160, at *3, *3 n.3 (D.N.J. Feb. 14, 2017). Congress specifically deprived this Court of jurisdiction to consider claims attacking certain discretionary decisions, including parole determinations, in 8 U.S.C. § 1252(a)(2)(B)(ii), which states that "[n]otwithstanding any . . . habeas corpus provision . . . no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or The Secretary of Homeland Security the authority for which is specified in this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." The effect of this statute on habeas claims challenging discretionary parole denials is clear—the Government "can and often does release . . . alien[s] on parole, but [the] decision to do so is not judicially reviewable." *Bolante v. Keisler*, 506 F.3d 618, 621 (7th Cir. 2007) (citations omitted); *see also Shimisany*, 2017 WL 592160 at *3 (declaring the Secretary of Homeland Security's decision to revoke parole unreviewable). This Court is therefore without jurisdiction to review Petitioner's claim that the denial of his parole request was improper, and that claim also fails to provide Petitioner a basis for relief at this time.

*3. Petitioner's Purported Religious Discrimination Claims*

In his final pair of claims, Petitioner asserts that the revocation of his visa was the result of anti-Muslim animus on the part of the Trump Administration, and therefore the revocation violates both the First Amendment and the Equal Protection Clause. (ECF No. 17-2 at 26–28; ECF No.

24-1 at 29–30). The Court notes that Petitioner did not raise this claim before the immigration judge. Generally, Due Process and constitutional claims are exempt from the exhaustion requirement, because they are beyond the scope of the authority of the immigration courts. *Sewak v. I.N.S.*, 900 F.2d 667, 670 (3d Cir. 1990). Yet Petitioner provides no meaningful evidence to support his assertion that the revocation of his visa was related to any governmental anti-Muslim bias. Indeed, in support of the contention that the visa was revoked based on such a bias, Petitioner points only to the fact that he was apparently questioned by officers about religious items in his possession, certain decontextualized statements made by President Trump during his campaign, and the two travel ban orders the Trump Administration put into place restricting travel to the United States from certain enumerated countries—a list which Petitioner admits did not include Afghanistan. (*See* ECF No. 17-2 at 27–28). In his various filings, Petitioner provides nothing to connect the alleged anti-Muslim animus of the Trump Administration to the actual revocation of his visa. Instead, he merely notes that one of the travel ban orders was to enter effect near the time of his visa revocation, and that the Government has provided no other basis for the decision to revoke his visa. (*Id.*).

Unfortunately for Petitioner, he is incorrect in stating that there was no other apparent basis for the revocation of Petitioner's visa in the administrative record. As the immigration judge noted in his decision, "the State Department revoked [Petitioner's] visa on the basis that 'information ha[d] come to light indicating that [he] may be inadmissible to the United States and ineligible to receive a visa,'" which the immigration judge concluded was a valid basis for revocation of a visa by the State Department. (ECF No. 27-1 at 7). Thus, the administrative record indicates that there was a reason unrelated to Petitioner's religion for the revocation of his visa, and Petitioner has

16

provided no evidence to support his contention that the alleged anti-Muslim bias of the Trump Administration was in any way involved in the revocation of his visa.

Petitioner also requests an evidentiary hearing. Pursuant to Rule 8 of the Rules Governing Section 2254 Cases, applicable to § 2241 petitions through Rule 1(b), the decision of whether to hold an evidentiary hearing in a habeas matter is left to the discretion of the Court. Because the Federal Rules of Civil Procedure apply to a habeas proceeding where not inconsistent with the habeas rules, *see* Rule 12 of the Rules Governing Section 2254 Cases, this Court may dismiss summarily any habeas claim which fails to allege sufficient facts "to raise a right to relief above the speculative level" pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Given the lack of any real evidence suggesting that anti-Muslim bias played a part in the revocation, and given the evidence to the contrary, this Court finds that, to the extent Petitioner's claim is not subject to exhaustion, Petitioner's religious discrimination claims do not rise above the level of speculation, and are insufficient to warrant habeas relief at this time and must be dismissed as such. For the same reasons, this Court concludes that no evidentiary hearing is warranted.

For the reasons set forth above, this Court will dismiss all of Petitioner's claims either because Petitioner has not exhausted his administrative remedies, because Petitioner's detention has not yet violated Due Process, or because Petitioner has presented no more than a speculative claim for relief. Petitioner's habeas petition must therefore be dismissed in its entirety without prejudice. Because this Court is dismissing Petitioner's habeas petition without prejudice, Petitioner's request for a preliminary injunction shall in turn be denied without prejudice as moot.

## III. CONCLUSION

For the reasons expressed above, this Court will dismiss Petitioner's habeas petition without prejudice, and will deny his Motion for a Preliminary Injunction as moot. An appropriate order follows.

Dated: January 29, 2018

JOSE L. LINARES,
Chief Judge, United States District Court